MILLER, Respondent, *v.* TALBOTT, Appellant.
(No. 8383.)

and

MARCYES et al., Respondents, *v.* TALBOTT, Appellant.

(Submitted April 7, 1943.   Decided June 24, 1943.)

[139 Pac. (2d) 502.]

2

See 9 Cal. Jur. 170; 16 Am. Jur. 516.

*Mr. Ralph L. Arnold,* for Appellant, submitted an original and a reply brief, and argued the cause orally.

*Messrs. Murphy, Garlington & Pauly,* for Respondent Rodney Miller, submitted a brief; *Mr. Edmond T. Fritz,* of counsel, argued the cause orally.

*Mr. Fred W. Schilling,* for Respondents Estelle Marcyes and General Board of the Church of Nazarenes, submitted a brief and argued the cause orally.

MR. JUSTICE MORRIS delivered the opinion of the court.

The complaint in this action was filed in the district court for Missoula county April 10, 1942, and numbered action 14968. April 11, 1942, the complaint in action 14969, entitled Estelle Marcyes et al. v. Lyle E. Talbott, was filed in the same court. Both actions involve the right of succession to the property of Orpha Miller Talbott, deceased. The defendant in both actions was the husband of the deceased. The plaintiff in the first action, Rodney Miller, is the nephew of the deceased, and the plaintiff, Estelle Marcyes, in the second action, is the sister of the deceased. At the time of her death Mrs. Talbott was the owner of a fractional five-acre tract of land with an appurtenant water right, located on "The Rattlesnake" out of the city of Missoula, and a contract of sale of a part of the five-acre tract, which contract was held in escrow in a Missoula bank. In the subsequent administration of the estate of the deceased the land was appraised at $900, and the contract at $952.68, which appears to have been the balance due thereon. A house was located on the land covered by the contract. The property involved in both actions was inherited by the deceased from her father's estate.

When the actions came to trial on stipulation they were consolidated, practically the same issues being involved in both, but separate judgments were made and entered.

A few days prior to August 9, 1941, Mr. Worden, a Missoula lawyer, received a phone call from Estelle Marcyes, one of the plaintiffs, who stated that her sister, Mrs. Talbott, desired to see him on business. Mr. Worden went to the Marcyes home

where Mrs. Talbott was confined to her bed, suffering from cancer. Mrs. Talbott advised Mr. Worden that she desired to dispose of her property, which she described as that above mentioned. She further advised Mr. Worden that she desired to give her husband, the defendant, and to her nephew, Rodney Miller each an undivided one-half of the fractional five-acre tract of land, and the contract of sale to her sister, Estelle Marcyes, and to the Church of Nazarene, in equal parts, one-half to each. Mr. Worden suggested making a will, to which Mrs. Talbott demurred on account of the costs of probate proceedings, saying she preferred to make deeds. In answer to a question by Mr. Worden, Mrs. Talbott stated her husband would not object to her disposing of the property as outlined. Mr. Worden returned to his office and prepared a deed conveying the land and an assignment of the escrow agreement as directed, and on August 9, 1942, he called on Mrs. Talbott and she executed the two instruments and Mr. Worden took her acknowledgments thereto. No other persons were present at any time the matters mentioned were under consideration by Mrs. Talbott and her attorney, and it does not appear that any one except Mrs. Talbott and Mr. Worden had any knowledge as to the contents of the two documents until after Mrs. Talbott's death some six weeks later, and Mr. Worden did not see Mrs. Talbott nor have any further dealings with her after he attended to the execution of the documents mentioned. The sister, Estelle, the brother, Russell Miller, the husband and some friends knew from Mrs. Talbott's conversation with them that she had arranged to dispose of her property, and on several occasions she expressed her keen satisfaction at having done so.

The day after decedent's death the defendant called at Mr. Worden's office, received and read the deed and assignment of the contract, and returned them to Mr. Worden. Later he refused to accept the deed, and when it became obvious that there would be litigation about the matter, Mr. Worden kept the instruments in his possession until they were presented in court during the trial. It appears that counsel for the parties agreed

that the instruments should remain with Mr. Worden pending the determination of the rights of the parties.

After the funeral the defendant petitioned for and was granted letters of administration of his wife's estate. The various essential proceedings appear to have been had, the inventory was made and filed, appraisers were appointed and made their return; the defendant paid all the hospital expenses, the medical fees, funeral expenses, for the services of nurses from time to time, and taxes on the land, in all amounting to the sum of $1,118.27. He made no charge for administering on the estate, but presented and was allowed an itemized claim against the estate for the above amount. Included in the claim of $1,118.27 were payments to Estelle Marcyes for services as nurse of $71; $284.25 to the N. P. Hospital; $339.15 to Stucky Funeral Home; $50 to St. Patrick's Hospital; $120 to Dr. Thornton; $142.50 to Western Montana Clinic, and a number of other smaller amounts paid to nurses and for other similar services rendered the deceased. The final account was made ''approved, allowed and settled'' by the court, and March 27, 1942, the ''Decree of Distribution of Estate'' was filed, by which it appears that the deceased died intestate and that her only heir at law was Lyle E. Talbott, the defendant, and the entire estate, consisting of the assets heretofore mentioned, was thereupon distributed to the said defendant, and he was ''fully and finally discharged from his trust as such administrator,'' and his sureties exonerated, by order of the court done on March 27, 1942. During the progress of the administration of the estate no objection of any nature was made to any act of the administrator by any one but April 10, 1942, the complaint in this action was filed and service admitted as of that date. Both actions are to quiet title. Rodney Miller, the plaintiff, alleges title to an undivided one-half interest in the fractional five-acre tract which he describes in his complaint, admits defendant also claims ownership of an undivided one-half interest in the same land, and in addition that defendant claims adversely to the plaintiff as to the other one-half, which latter claim plaintiff alleges to be without right

and demands that the defendant be required to set forth his claim, that the same be adjudicated and declared void and that plaintiff's title to a one-half interest be quieted in him.

In addition to a general denial made by the answer, an affirmative defense by way of a cross-complaint is set up whereby it is alleged, among other things, that Mrs. Orpha M. Talbott died intestate, leaving no surviving mother, father or children, recounts the administration of Mrs. Talbott's estate as hereinbefore outlined, mentions the expenses of administration as being approximately $150 and defendant's administration of the estate without charge, and further alleges there was no money in the estate and the necessity of his advancing costs of administration, and the allowance of his claim against the estate in the amount heretofore mentioned which reduced the value of the estate to approximately $600; mentions giving notice of hearing on the administrator's final account, hearing thereon and its approval without objection, demands plaintiff's complaint be dismissed and defendant's title to the land be quieted, with costs.

During the trial defendant offered proof of publication of notice to creditors relative to the defendant's administration of his wife's estate, and likewise offered in evidence his itemized claim against the estate which, as heretofore stated, was approved and allowed by the court and paid. The court at the time the offers of proof were made reserved ruling on objections made to the admission of such evidence, but in preparing its opinion the court made its ruling sustaining such objections commenting at length relative to the exclusion of the claim that had been theretofore approved by the court and paid. The court's findings in the action at bar are in direct conflict with its own decree entered relative to its approval of the defendant's final account in the administration of the estate and the decree of distribution thereon. This presents an unusual problem which will be passed here to be adverted to later if our final conclusions render it necessary for us to determine whether in our opinion that ruling of the court in effect revokes its former decree by collateral proceeding as contended by the defendant.

The court's decree in the instant actions upholds the deed and assignment of the contract and vests in the plaintiffs respectively clear titles to the property described in the two instruments, and denies defendant's claims of $1,118.27 *in toto*. The court's revocation of its former decree relative to such claims is predicated upon the court's statement appearing in the record in the nature of a preamble to its findings of fact which statement is as follows: "No proof is submitted by the defendant that during such time he was unable to support his wife, and the bills were properly his to pay, and the fact that he paid them as they were incurred negatives any idea that he could not do so." The principal items of the bill have been heretofore mentioned, and the expenditures appear to have covered the period of Mrs. Talbott's illness of approximately three years.

Decrees were made and entered in each case in accordance with the respective demands of the plaintiffs, and in respect to the contract of sale, the defendant is required to account for all payments made to him thereon subsequent to Mrs. Talbott's death. The defendant appealed.

A number of specifications of error are assigned, but it is our view that the merits of the controversy turn on the question of delivery of the two instruments. We think there is no doubt as to the intention of the deceased to dispose of her property at the time she executed the instruments, practically in accordance with the contentions of the plaintiffs, but intentions to dispose of property, by will or by instruments of conveyance made in contemplation of death, to be legal, must conform to certain universally recognized and established formalities. The intentions of a testator may be set out clearly in his will and expressed in forceful language, but if his will is not declared to be his will in the presence of two witnesses who at his request and in his presence subscribe their names thereto, his will cannot be admitted to probate. The delivery of a deed made in contemplation of death is not attended with such strict formality as the execution of a will, but it is not effective as a conveyance until de-

8

livered. Our pertinent statutes relative to delivery are as follows:

"Sec. 6843. A grant takes effect, so as to vest the interest intended to be transferred, only upon its delivery by the grantor."

"Sec. 6845. A grant cannot be delivered to the grantee conditionally. Delivery to him, or to his agent as such, is necessarily absolute, and the instrument takes effect thereupon, discharged of any condition on which the delivery is made."

"Sec. 6846. A grant may be deposited by the grantor with a third person, to be delivered on performance of a condition, and, on delivery by the depositary, it will take effect. While in the possession of the third person, and subject to condition, it is called an escrow."

"Sec. 6848. Though a grant be not actually delivered into the possession of the grantee, it is yet to be deemed constructively delivered in the following cases: * * *

"2. Where it is delivered to a stranger for the benefit of the grantee, and his assent is shown, or may be presumed."

The assignment of the contract of sale was expressly made to take effect on the death of Mrs. Talbott, not before. The deed contains no provision relating to the date of delivery, or the time it should become effective, but the two instruments had but a single purpose, were prepared and executed at the same time, made to dispose of all deceased's property, and we think it must be assumed that the deed, the same as the contract, should not be delivered until after the grantor's death. Mr. Worden testified that such was his impression. Thus we proceed on the presumption that the conveyances were not intended in either case to become effective until the death of the grantor.

It is the general rule that "It is essential to delivery that the grantor part with dominion and control over the deed, so that it is beyond the possibility of recovery * * *." (26 C. J. S., Deeds, page 238, sec. 42.)

Where, as here, the delivery is to a third person the rule is, "It is not necessary that a delivery of a deed should be made to

the grantee himself, but it will be sufficient if it is delivered to a third person for the use of the grantee. Such a delivery to a third person for the grantee, however, will not be effectual unless it is made in such a way that the grantor parts with all control over the instrument. As in the case of delivery generally, see supra section 41, the intent of the grantor to transfer present title to the grantee is the controlling element in cases of delivery to a third person.'' (26 C. J. S., Deeds, page 241, sec. 43; see, also, 16 Am. Jur. page 517, sec. 143.)

Under the heading ''Essentials of a valid delivery. Generally,'' it is said in 52 A. L. R., page 1223, that ''When the owner of land delivers a deed to a third person or depositary, with directions to the latter to hold the deed during the lifetime of the grantor, and upon the latter's death to deliver it to the grantee, intending at the time of the delivery to the custodian to part forever with all right or power thereafter to repossess, retake, or control the deed, such delivery is effectual and valid, and upon the death of the grantor the grantee may, if necessary, then compel delivery. This rule, which is supported by many cases cited in the annotations previously referred to, is also supported by later cases.'' In support of this text cases are cited from the United States Supreme Court and from the following states: Alabama, Arkansas, California, Illinois, Indiana, Iowa, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, New Jersey, New York, Ohio, Oklahoma, Oregon, South Dakota, Texas, Utah, Washington and Wisconsin.

In a note at page 204 of 18 C. J., it is said relative to delivery of a deed: ''Perhaps the clearest and completest statement of the law on the subject is the following, by Dowling, J., in *Osborne* v. *Eslinger,* 155 Ind. 351, 360, 58 N. E. 439, 80 Am. St. Rep. 240, 247: 'Where the claim of title rests upon the delivery of the deed to a third person, the deed must have been properly signed by the grantor, and delivered by him, or by his direction, unconditionally, to a third person for the use of the grantee, to be delivered by such person to the grantee, either presently, or at some future day, or upon some inevitable contingency, the

grantor parting, and intending to part, with all dominion and control over it, and absolutely surrendering his possession and authority over the instrument, so that it would be the duty of the custodian or trustee for the grantee, on his behalf, and as his agent and trustee, to refuse to return the deed to the grantor, for any purpose, if demand should be made upon him. And there should be evidence beyond such delivery of the intent of the grantor to part with his title, and the control of the deed, and that such delivery is for the use of the grantee. If the deed is placed in the hands of a third person, as the agent, friend, or bailee of the grantor, for safekeeping only, and not for delivery to the grantee; if the fact that the instrument is a deed is not made known to such third person, either at the time it is handed over, or at any time before the death of the grantor; if the name of the grantee, or other description of him, is not given; and if there is no evidence beyond the mere fact of such delivery of the intent of the grantor to part with his control over the instrument and his title to the land—then such transfer of the mere possession of the instrument does not constitute a delivery, and the instrument fails for want of execution.' ''

Next we will review the decisions of this court on the question of delivery in actions involving facts and circumstances similar to those involved in the cases at bar.

In *Springhorn* v. *Springer*, 75 Mont. 294, 243 Pac. 803, 804, the purpose of the action was to have a deed, from a husband to his wife, declared void in order to subject the deeded property to a judgment against the husband. The plaintiff challenged delivery of the deed to the wife. After quoting section 6843, Revised Codes, the court said: ''The facts and circumstances which have been held sufficient to constitute the actual or constructive delivery of a deed are exceedingly numerous and varied. ▉ (8 R. C. L., p. 985, sec. 53.) While delivery may be by either words or acts, or both combined, and actual, manual handing over of the deed to the grantee by the grantor is not required, it is settled that delivery is not complete until the grantor has so dealt with the instrument as a means of divesting his title as to

lose all control over it and place it beyond the right of recall. It is required that the grantor shall unequivocally indicate it to be his intention that the instrument shall take effect as a conveyance of property in order to have it produce that result." (Citing cases.)

Next is the case of *Plymale* v. *Keene*, 76 Mont. 403, 247 Pac. 554, 555, strongly relied on by plaintiffs. In that case the husband and father, while his wife was alive, made three deeds to separate parts of his real properties. By one he divided and deeded in equal portions what was known as the "home place" to his two daughters. By the other deed the "lower place" was deeded to his son, who was married, lived thereon and had substantially improved it, but the grantor's wife declined to sign the deeds on the ground that the husband had no right to sign away her property, obviously having in mind her dower right. New deeds were made conveying the lands as before, but the three conveyances gave to the wife a joint interest in the three tracts of land, along with each child's respective right, in such tracts. The wife died before her husband and with the assistance of the son and one daughter, the other daughter having been advised of a family meeting and the purpose to make new deeds, but who did not appear, made new deeds conveying the property in practically the same manner as before, leaving out the deceased wife and mother. The father and son then went to the First National Bank of Townsend, where the father signed and acknowledged the deeds before a notary, and placed the deeds in three separate envelopes. Each envelope was appropriately endorsed to identify the child whose deed was contained therein, the endorsement on the three being of like tenor. In the course of the opinion it was said:

"The envelope containing the Gray P. Keene deed reads: 'The First National Bank of Townsend, Mont. Deliver to Gray P. Keene of Canton, Mont. after the death of Harvey L. Keene and his funeral expenses are paid.' The envelopes were then deposited with the bank, and Miss Corey, for the cashier, executed three receipts. These appear to have been written upon stock

forms in use by the bank. * * * " 'Not negotiable.    No. 10

" 'Property Deposited for Safe-Keeping with the First National Bank, Townsend, Montana.

" 'Dec. 10, 1921.

" 'This certifies that H. L. Keene has deposited with the 1st Natl. Bk. Townsend for safe-keeping, the following described property, viz.: 1 envelope containing deed to be delivered to Gray P. Keene after the death of Harvey L. Keene & his funeral expenses are paid. At owner's risk.

" 'E. C. Corey, for Cashier.

" 'H. L. Keene, accepted.'

"When the receipt was handed to Harvey L. Keene he signed it and delivered it to Gray P. Keene, who retained it until after the death of his father.

"Some months after Mr. Keene's death, which occurred December 22, 1922, Gray P. Keene filed an affidavit showing that his father's funeral expenses had been paid, and received from the bank the envelope containing the deed. He then placed the deed of record. This suit resulted. The court found for the defendant, Gray P. Keene, and the plaintiffs appealed * * *

"2. In an exhaustive note to the case of *Jackson* v. *Jackson,* 67 Or. 44, 135 Pac. 201, as reported in Ann. Cas. 1915C, p. 373, it is stated that it is well settled that if a deed, fully executed and so drawn as to convey a present title, is deposited by the grantor with a third person with directions to deliver it to the grantee after the death of the grantor, and the grantor in making such deposit reserves no power to recall or modify the same, or thereafter to control in any manner the disposition of the deed, the delivery will be deemed complete as of the date when the deed is deposited. (*Martin* v. *Flaharty,* 13 Mont. 96, 32 Pac. 287, 19 L. R. A. 242, 40 Am. St. Rep. 415, is cited in accord.)

"In a case found in Ann. Cas. 1915C, 381, immediately following *Jackson* v. *Jackson,* the Supreme court of Alabama (*Seeley* v. *Curts,* 180 Ala. 445, 61 So. 807), declared: 'A grantor may deliver a deed to a third person, to hold until the grantor's death, and then to deliver it to the grantee. Such a delivery is perfectly

valid; but the deed must be left with the depositary without a reservation by the grantor, express or implied, of the right to retake it or otherwise control its use.' * * *

"Mr. Keene deposited the deed with an express direction as to its delivery. As indicating his intention at that time, he gave to his son the receipt for the envelope containing the Gray P. Keene deed. Nothing was said or done by Harvey L. Keene to indicate that he retained in his mind any reservation with respect to the deed. The words 'for safe-keeping,' considered with the context, have no material bearing. If Harvey L. Keene ever intended to attempt to recall the deed from the depositary no one but himself ever knew it.

"When one has the mental capacity to alter his intention with respect to a deed thus deposited, but dies without doing so, there is 'but little reason for saying that his deed shall be inoperative, simply because, during life, he might have done that which he did not do. It is much more consonant with reason to determine the effect of the deed by the intention existing up to the time of death than to refuse to give it that effect because the intention might have been changed.' "

It is our opinion that the last paragraph of the above citation is not supported by the preponderance of authority of either this court or other jurisdictions. It is, we think, too broad. The *Plymale case* is far stronger in support of our view on the essential question of delivery than the cases at bar.

Next is the case of *Hayes* v. *Moffatt,* 83 Mont. 214, 271 Pac. 433, 435, 437. A deed was made by the owner of certain lands in Custer county and was recorded. The grantor alleged in her complaint filed in an action seeking cancellation on the ground that the deed was never delivered to the grantee, was not intended to take effect until after death, and that subsequent to the time the deed was made the grantor had changed her mind. The court said:

"The interests of a grantor and a grantee are diametrically opposite; both cannot, consistently with its objects,. have control of a deed at the same time, and until the grantor parts with all

control over it, that of the grantee does not attach (*Provart* v. *Harris*, 150 Ill. 40, 36 N. E. 958); and when, as found by the court, the defendant took the deed from its receptacle and had it recorded, it not having been delivered to him, his action was wrongful, even though he had access to the receptacle, and the recordation of the instrument was without effect.

"Even though the deed was handed to defendant by the notary public and by him placed in the depositary can, as he contends, if the intention of the parties was that the deed was not to be effective and not to be recorded until after plaintiff's death, and plaintiff had access to the can and to the deed at all times up to its removal by defendant without her knowledge or consent, there was no delivery, and the deed was no more effective than it would have been without such manual tradition. (*Hotaling* v. *Hotaling*, [193 Cal. 368, 224 Pac. 455, 56 A. L. R. 734)]."

The next case is *Carnahan* v. *Gupton*, 109 Mont. 244, 96 Pac. (2d) 513, 514. The facts as given in the opinion are that:

"On February 8, 1932, G. S. Gupton made and executed five warranty deeds purporting to convey to E. S. Gupton and his wife all of the five sections of land in question. On the same date G. S. Gupton put these five deeds in a sealed envelope, addressed that envelope to the grantees named in the deeds, and placed the envelope in his safety deposit box in the Bank of Miles City, at Miles City, Montana. At the same time G. S. Gupton mailed a letter to E. S. Gupton, one of the grantees in the above-mentioned five deeds, which letter is as follows:

" 'Miles City Mont Feb. 8, 1932.

" 'Mr. E. S. Gupton.

" 'Gillette Wyo.

" 'Dear Sir;

" 'I have today placed in the Bank of Miles-City. At Miles City, Mont. in lock box Number 1210. a sealed Envelope Addressed to E. S. Gupton. Gillette Wyo. Deeds to Sec. 9. sec. 7. sec. 11. sec. 5. sec. 19. all in T. 9. N. R. 57 E. In Fallon County Mont. made in your favor, and at my death and when notified

of my death, present this letter to the Bank of Miles City at Miles City Mont and same will be delivered. to you.

" 'Yours truly.

(s) G. S. Gupton'

" 'GSG

"That letter was received by E. S. Gupton. The envelope containing the five deeds remained in G. S. Gupton's safety deposit box until after his death. He alone had access to that safety deposit box. After the death of G. S. Gupton the deeds in question were turned over to E. S. Gupton by the administrator of G. S. Gupton's estate and placed of record by E. S. Gupton. * * *

"The court * * * found that E. S. Gupton and Mary Gupton obtained possession of these deeds without right.

"From such findings of fact the court drew its conclusions of law, in so far as material here, as follows: 'That there was no delivery either actual or constructive of the five deeds from George S. Gupton to E. S. Gupton and Mary Gupton; * * * and that said deeds were revoked and were rendered null and void by the death of the grantor, G. S. Gupton, prior to delivery, and are of no force and effect.' * * *' "

After quoting from the case of *Springhorn* v. *Springer*, supra, on the question of delivery substantially as we have heretofore quoted from that case, the court said:

"A careful consideration of the undisputed facts here impel us to the conclusion that these fall far short of meeting those requirements. These facts disclose that after the execution of these deeds, the grantor placed them in an envelope which he sealed and addressed to the grantees. At the same time he wrote the letter hereinbefore quoted. On the same day, or about that time, he took this envelope, together with the letter, or a copy of it, to the Bank of Miles City, and there had a talk with a Mr. Flinn, an officer of that bank. Flinn read the letter and then said, in substance, to the grantor: 'Steve, if anything happens to you we have no authority to enter that box and deliver those papers to anyone else. What you should do is

16

authorize someone else to have access to that box.' To this Gupton replied: 'That's all right. My nephew has a letter.' The grantor then placed the envelope in his safety deposit box. No one had access to that box at that time, or at any other time during the lifetime of G. S. Gupton, except the grantor himself. The bank did not have access to it. In other words, that safety deposit box was under the absolute and exclusive control of the grantor, and that condition continued so long as the grantor remained alive. The deeds in question did not come into the possession of the grantees, or either of them, until after the grantor's death. * * *

"Was there a constructive delivery as the same is defined in paragraph one of Section 6848? Was there an agreement between the grantor and the grantees at the time of the execution of these five deeds that they were to be then delivered? Were the circumstances such that the grantees named in those five deeds were then entitled to immediate delivery? The facts here compel a negative answer. True, the grantor wrote to one of the grantees saying, in substance, that these deeds would be delivered to him after the death of the grantor; but there can be no delivery of a deed after death, for a dead man is not capable of any activity. (*Jones* v. *Jones,* 6 Conn. 111, 16 Am. Dec., 35, and note; *Hayes* v. *Moffatt,* 83 Mont. 214, 271 Pac. 433.) There is no evidence which warrants the conclusions that the grantees were entitled to immediate possession. * * *

"The Supreme Court of Colorado, in the case of *Griffith* v. *Sands,* 84 Colo. 456, 271 Pac. 191, says: 'The first question is whether directions by a grantor, in an instrument which he had signed, sealed, and acknowledged, to deliver the same after his death, amount to constructive delivery. We think not. (*Childers* v. *Baird,* 59 Colo. 382, 148 Pac. 854). Indeed, *the complaint shows that there was no delivery because the deed was to be delivered at grantor's death; there could not, then, have been a previous delivery.* This is the ever-recurring case of an attempt at once to give property and keep it, and as long as men keep on trying to do that lawyers will not starve. True, delivery

has been said to be a matter of intent, but it is not a matter of intent alone. Some act by which the grantor parts with control of the instrument must accompany the intent (citing cases), but plaintiff's grantor retained the deed and might have withheld it indefinitely, or destroyed it, without liability. It is essential to delivery of a deed that the grantor part with control of it, which James did not do.'

"The California Supreme Court, in the case of *Fisher* v. *Oliver*, 174 Cal. 781, 164 Pac. 800, 803, says: 'For, saving under exceptional circumstances which do not here arise, ownership of real estate so far as that ownership is to be parted with by deed necessitates a delivery of that deed to terminate the grantor's title. And it is unquestionably the general rule that, where a deed remains in the possession of a grantor, to be delivered and to take effect after his death, the deed is void for want of delivery during his lifetime. (*Moore* v. *Trott*, supra, [156 Cal. 353], 104 Pac. 578, 134 Am. St. Rep. 131; Id., 162 Cal. 268, 122 Pac. 462); *Denis* v. *Velati*, 96 Cal. 223, 31 Pac. 1; Devlin, Deeds, par. 279; *Stevens* v. *Hatch*, 6 Minn. 64, 6 Gil. 19; *Stilwell* v. *Hubbard*, 20 Wend., N. Y., 44; *Walter* v. *Way*, 170 Ill. 96, 104, 48 N. E. 421.)' "

We have confined citations to the general rule laid down by textwriters and to decisions of this court, but the decisions of the supreme court of Michigan in *Hynes* v. *Halstead*, 282 Mich. 627, 276 N. W. 578, 580, is particularly pertinent. It was there said: "A deed to be operative must be delivered. It must be placed beyond recall. It must pass title to the grantee. It must have been made operative during the lifetime of the grantor. If there was no delivery until after death of the grantor, the deed would be ineffectual. To be made operative after death, it must have been made effectual during the lifetime of the grantor."

We now return to the record in the instant actions for the evidence on the question of delivery of the two instruments which were prepared by Mr. Worden, at the grantor's request, acknowledged before him and kept in his safe until after the grantor's death. All the material evidence on this point is the

testimony of Mr. Worden from which we quote the essential parts: On direct examination he testified:

"Q. As specifically as you can, will you tell us what her instructions to you were, with respect to this property, and the work you were to do for her? A. My instructions were to prepare the necessary instruments so that upon her death this property would go to her husband and her nephew, the real estate, and the assignment of the contract should go to her sister and to this Board of Foreign Missions of the Nazarene Church. I think it's Kansas City. She gave me the address at the time.

"Q. Then did you carry out those instructions? A. Yes. I returned to my office and prepared these papers, and as I recall it, it was several days before I went back there. I think I called once, and was informed by Mrs. Marcyes that Mrs. Talbott was not very well. At any rate, I did go back on the 9th of July with these instruments. At that time we went over them again as to the descriptions. At that time Mrs. Talbott executed the deed and the assignment. I acknowledged the deed. I think there is an acknowledgment also on the assignment. After which I asked her if I should take them and put them in my safe or whether she wished to keep them there. She told me to keep them in my safe. I did that. And I had no further conversation with Mrs. Talbott during her lifetime. I heard of her death. It must have been a month or six weeks after this. I don't recall the date. I got it from the newspaper.

"Q. Do you have those instruments with you? A. Yes, I do.

"Q. Will you produce them? I hand you now an instrument marked Plaintiff's Exhibit 1, and ask you if you can identify the exhibit? A. Yes, I can.

"Q. Tell us what it is? A. It's the deed to which I have referred, and which was executed by Orpha H. Miller Talbott on the 8th day of August, 1941.

"Q. That's the instrument which you have referred to in your testimony?

"The Court: You said August?

"A. Yes, it's the 9th of August. That's the proper date. I was under the impression it was July, but it was August."

He was then handed and identified the deed and assignment of contract of sale, introduced in evidence as Exhibits 1 and 2, and the examination was continued:

"Q. When these exhibits, 1 and 2, were handed to you by Mrs. Talbott, was any statement made to you by her that she desired to retain and exercise control and authority over them while in your possession? A. No, I don't recall any statement to that effect.

"Q. Will you tell us whether the substance of her instructions to you were to effectuate and complete the transfer of the properties referred to in Exhibits 1 and 2, or to make simply a provisional one which was subject to her control and reservation at any time? A. I will answer your question in this way: That there were no definite instructions in regard to these instruments from Mrs. Talbott. If I may be permitted to digress. Mrs. Talbott was very sick when I saw her. They had arrangements there for eating, sleeping and living completely in that room. I was a little reluctant about speaking to her of the matter of death. I think I felt, from observation of her, that it couldn't have been very far away. Consequently, I didn't say, 'Shall I hold these until you die?', but the impression was that I should keep these instruments, and upon her death deliver them to the grantees. That's about the sum and substance of the whole transaction. I took them, and took them to my office, and put them in this envelope, which is marked by my stenographer, and they have remained there in the office, except such times as you and Mr. Schilling and Mr. Arnold have examined them, from that day to this. The entire purpose of this business was to fix up this property. That's what I went there for. That's what I attempted to do.

"Q. Have you now described in full detail as you can what has transpired with reference to Exhibits 1 and 2? A. I think all * * *."

On cross-examination Mr. Worden testified in part as follows:

"Q. You stated, in answer to Mr. Garlington's question, that it was your impression that these deeds were to be delivered by you to the grantees upon her death. That impression was not gained from any statement that she made to you, was it? A. Only from the general nature of the transaction. There wasn't any specific statement on her part that 'I shall keep these until she dies, and then turn them over to them.'

"Q. You had no such direction whatever? A. Not specifically. * * *

"Q. You merely assumed that, upon her death and the coming to your office of the grantees, they would be delivered to them? Is that not the case in this instance? A. Yes, I think that's correct. These instruments were to be delivered after her death.

"Q. Is it not a fact that, when you asked her the question, 'Shall I leave the instruments with you, or put them in my safe', she merely said, 'Put them in your safe'? That's the only instructions you received? A. She said, 'Take them and and keep them.' She had no place to keep them. To keep them in the safe. * * *

"Q. Had she during any of the time after the execution of the deed, August 9th, 1941, demanded return of the instruments to her, was there anything in your instructions that would forbid your returning them to her?

"Mr. Garlington: That is objected to as incompetent, irrelevant and immaterial.

"The Court: Overruled.

"A. No, there was not. * * *

"Q. Would you tell us what words, directions or instructions on the part of the grantor Orpha M. Talbott gave you the impression that you were to deliver these instruments upon her death to the grantees? A. I can't give you the exact conversation. I don't recall it. The impression was gained very largely from the fact that I was called there to prepare the necessary instruments for disposal of her property; that we discussed the making of a will to dispose of it; and her statement that she

wanted it divided in certain ways; and in the assignment itself, it providing for the disposal of the balance after her death. To repeat the conversation in detail would be impossible for me to do at this time, because I don't remember. That's the general nature of the whole transaction. It was such that that was the only conclusion I could come to.

"Q. In other words, there were no directions or instructions to you in words to this effect: 'Mr. Worden, you keep these instruments and upon my death deliver them to the grantees'? There were no such words or directions? A. No. I don't think there were.

"Mr. Arnold: That's all."

Re-direct examination by Mr. Garlington:

"Q. When you say, 'No, I don't think there were', your meaning is that you recall no express statement to that effect? A. That's correct. As I recall it, there was no express direction by Mrs. Talbott to hold these until her death and then to do certain things with them."

This evidence as to delivery does not measure up to the requirements of the general rule nor that followed by this court in similar cases cited. The instruments were not beyond the control of the deceased when they were in the custody of her attorney, and his "impression" as to what he should do with the instruments does not constitute "instruction" such as the general rule requires.

In view of our conclusions we deem the consideration and determinations of other questions raised unnecessary. Under section 7073, Revised Codes, as amended by Chapter 140, Laws of 1941, the husband is entitled to all the wife's property where no issue or father or mother survives.

The judgments are reversed, and the actions remanded with instructions to revise the findings to accord with this opinion and enter judgments for the defendant.

Mr. Chief Justice Johnson and Mr. Justice Adair concur.

MR. JUSTICE ERICKSON:

I dissent. I think the majority has reached an erroneous conclusion when it reverses the finding of the district court in these cases. In holding as it has, the majority has completely overlooked the requirement of the rule so well established in Montana that it needs no citation that this court will presume that the judgment of the district court is correct and will not reverse such judgment if there is any substantial testimony in support of it. Further, the majority, in reaching the conclusion it has, has seized upon certain small portions of the testimony of the principal witness, deceased's attorney, and has ignored completely the major part of his testimony and all of the other evidence in the case.

Orpha Talbott, in her lifetime, owned the property we are here dealing with. She had a right to dispose of this property as she chose. She attempted to make disposition of it while she was still able to and while she was on her death bed, by word, act and deed. She made this disposition with the aid and advice of an able, experienced member of the bar of the State of Montana. Orpha Talbott is now dead. The decision of the majority completely defeats her will. Her property is now disposed of in a way that she did not intend, and Orpha Talbott is no longer able to undo what has been done by this court and give this property as she wished, either by deed or will.

While it is true as we said in *Carnahan* v. *Gupton,* 109 Mont. 244, 96 Pac. (2d) 513, that certain things must be done before any intention to convey, no matter how clearly expressed, may become effective, this court, in considering this case, should and as we did in *Plymale* v. *Keene,* 76 Mont. 403, 247 Pac. 554, 556, examine the facts and apply the law so as to give effect to Orpha Talbott's intention and not to defeat it if at all possible. It is not the province of this court to determine to whom Orpha Talbott owed her largess and substitute our views as to what should be done with this property. The testimony shows that her mind was keen, that she had given a great deal of thought to this matter and that she had consulted those interested, and that these instru-

ments were executed only after very careful thought and consideration on her part.

The majority opinion in general states the rule correctly to be applied in determining the intention on the part of the grantor to deliver the deed to a third person for the benefit of the grantee, but it has expressly overruled the settled law in the State of Montana as announced by Mr. Chief Justice Callaway in 1926 in the case of *Plymale* v. *Keene,* supra, and in applying the general rule I feel that it has completely disregarded the policy of this court and has gone contrary to all the authorities dealing with fact situations similar to the one obtaining in this case.

It may be well to state again and in a little more detail the rule obtaining in a situation like the one now before us. ''Delivery to a third person is sufficient if made for, and on behalf of, the grantee, to one acting solely as the grantor's agent, with express or *implied* instructions to the depositary to deliver the deed to the grantee.'' (26 C. J. S., Deeds, sec. 43, p. 242.) And as is said in *Plymale* v. *Keene,* supra, ''if a deed, fully executed and so drawn as to convey a present title, is deposited by the grantor with a third person with directions to deliver it to the grantee after the death of the grantor, and the grantor in making such deposit reserves no power to recall or modify the same, or thereafter to control in any manner the disposition of the deed, the delivery will be deemed complete as of the date when the deed is deposited.''

The only question in this case is whether or not the grantor intended the physical delivery to her attorney to be an irrevocable delivery for the purpose of divesting herself of title, and with directions, express or implied, that her attorney as depositary of the deed and assignment deliver them upon her death to the grantees named. The majority seem to take the view that such intention to make the irrevocable delivery must be expressed in so many words and it overruled what we said in *Plymale* v. *Keene,* supra, to the effect that unless the grantor expressly reserved the right to the control of the instrument the court must deem the delivery irrevocable. It seems to me

that as to the latter point, the rule in the *Plymale case* is sound and supported unanimously by the authorities.

As to how the grantor's intention as to the delivery is to be determined, the rule is settled that ''The grantor's intent may lawfully be expressed to the custodian of the deed either orally or in writing or by recitals in the deed or by his acts and conduct at the time of or subsequent to delivery.'' (16 Am. Jur. 519.) And it is said in the same work on page 521, '' * * * No *· * * particular act or form of words is necessary to establish the delivery of a deed. The controlling factor is the intention to make delivery and this intention may be inferred from the grantor's words and acts and from the circumstances preceding, attending and subsequent to the execution of the instrument.'' (See, also, *Murrer* v. *Murrer,* 106 Ind. App. 304, 19 N. E. (2d) 494; *Anderson* v. *Mauk,* 179 Okl. 640, 67 Pac. (2d) 429; *Saltzsieder* v. *Saltzsieder,* 219 N. Y. 523, 144 N. E. 856; *Hinshaw* v. *Hopkins,* 37 Cal. App. (2d) 230, 99 Pac. (2d) 283.)

Now let us look at the testimony that the majority has ignored and which clearly supports the judgment of the district court. On cross-examination, deceased's attorney, who is the scrivener of the instruments and their depositary, stated that he could not recall the exact ''words, directions, or instructions'' on the part of the grantor Orpha M. Talbott that she intended delivery of these instruments within the rule to him as depositary with instruction to deliver to the grantee upon her death, and this testimony is relied upon by the majority in reaching the conclusion it has. But this overlooks the balance of his testimony. He testified that he was called to the house of the deceased while she was lying on her death bed with full knowledge on her part that she had but a short time to live, that they discussed at some length the disposition of her property, that she explained to him ''that she wished to dispose of'' her property and told him that she wished to give it to the parties afterwards named grantees in the deed and assignment. She vetoed the suggestion on his part of a will. He stated that her instructions to him on the day of this first visit were that he ''prepare the necessary

instruments so that upon her death the property would go to her husband and her nephew, the real estate, and the assignment of the contract should go to her sister and to this board of Foreign Missions of the Nazarene Church.'' He prepared the instruments according to these instructions and awaited a call from her to return with them so that she might execute them. He stated that at the time of the execution of the instruments she said nothing indicating any desire on her part to retain and exercise any control or authority over the instruments while in his possession. He was then asked, ''Q. Will you tell us whether the substance of her instructions to you were to effectuate and complete the transfer of the property referred to in Exhibits 1 and 2, or to make simply a provisional one which was subject to her control and reservation at any time. A. I will answer your question in this way: that there were no definite instructions with regard to these instruments from Mrs. Talbott. If I may be permitted to digress, Mrs. Talbott was very sick when I saw her. They had arrangements there for eating, sleeping and living completely in that room. I was a little reluctant about speaking to her of the matter of death. I think I felt, from observation of her, that it couldn't have been very far away. Consequently, I didn't say, 'Shall I hold these until you die?', but the impression was that I should keep these instruments, and upon her death deliver them to the grantees. That's about the sum and substance of the whole transaction. * * * *The entire purpose of this business was to fix up this property. That's what I went there for. That's what I attempted to do.''* Later, on cross-examination, the witness stated, ''The impression was gained very largely from the fact that I was called there to prepare the necessary instruments for disposal of her property; that we discussed the making of a will to dispose of it; and her statement that she wanted it divided in certain ways; and *in the assignment itself, it providing for the disposal of the balance after her death.* To repeat the conversation in detail would be impossible for me to do at this time, because I don't remember. That's the general nature of the whole transaction. It was such

that that was the only conclusion I could come to.'' He was asked, ''The impression which you gained as to your duties with respect to Exhibits 1 and 2, I take it, was gained from the general tenor of the discussions, her physical condition, and your understanding of each other's impression of the matter that you had during the conversation? A. That's correct, yes.'' He was further asked, ''Will you tell us whether the discussion centered around some means of making an effective disposal of her property? A. Yes, it did, of this particular property. Q. You were instructed by her to do that for her? A. That's right.''

When all of the testimony of deceased's attorney is considered it is very clear that from his testimony alone the district court was warranted in finding that there had been a compliance with the rule as to delivery. He did not testify, when all of that he said is considered, that she expressly directed him to take and keep the deed for her for safekeeping as the majority assumes. The transaction was a great deal more than that as the quoted testimony shows. The grantor's attorney could properly testify as to what he understood Mrs. Talbott's intentions were when she had the instruments executed and turned them over to him. His testimony shows that he understood that it was Mrs. Talbott's intention to make an effective delivery of the instruments and his conduct both at that time and subsequent to her death shows that he clearly understood that she intended a complete delivery without reserving in herself any power to revoke that delivery. His understanding of what his instructions were and his conduct, in view of his standing before the bar of the state of Montana, is entitled to great weight in this court.

Aside from the testimony of the principal witness there is abundant other testimony showing delivery under the rule stated above. Here we have a case where the grantor knew that she had but a few weeks at the most to live and she could have little purpose in wanting to maintain control over the deeds as is the case where death is not imminent. On many occasions prior to the time of the execution of these instruments, she communicated to those around her her desire to dispose of her property during

her lifetime.  Under the rule stated in 26 C. J. S., Deeds, section 42, supra, the acts and words of the grantor up to the time of the execution of the instrument, her subsequent conduct, and the circumstances surrounding the transactions may properly be considered by the court.  After the delivery of the instruments to her attorney, Mrs. Talbott spoke of the matter to a number of the witnesses who testified that she spoke of the disposition of her property in the past tense as having been completed.  For example, one witness testified, ''She told me that she had it all fixed up as to disposition of her property,'' and ''That she had gotten Mr. Worden [her attorney] to fix up the papers and she had disposed of her property according to her wishes.  That was the substance of it.''  To still another witness she said, ''The papers are made out and it is all settled.  I am glad it is over with.''  And she told another witness, ''I am so relieved and so happy that I have been given strength enough to go through this business today and it is settled.''  And, ''I have made deeds because if I had made a will it will be probated and that will be a lot of expense and the deeds will be safer and I have made deeds.''  She lived some six weeks after the execution of the instruments and their delivery to her attorney.  He did not again communicate with her nor did she make any attempt in any way to regain possession of the instruments.  The testimony as to her statements made subsequent to the delivery and her conduct after that time until her death showed very strongly that Mrs. Talbott took the view that the instruments were final disposition of her property and that she no longer had control over them or any right to revoke what she had done.  In the case of the assignment she reserved in herself a right to the income during her lifetime.  If the delivery was not intended as final there would be no purpose in making this reservation.

It seems to me clear that the evidence is ample to support the judgment of the district court, and that it shows an intention on the part of the grantor to make an effective delivery to the depositary with the directions to deliver to the grantee on the death of the grantor and that the grantor retained no power of

revocation. If I had any doubt on the latter score, I think this court should adhere to the rule announced in *Plymale* v. *Keene,* supra: ''When one has the mental capacity to alter his intention with respect to a deed thus deposited, but dies without doing so, there is 'but little reason for saying that his deed shall be inoperative, simply because, during life, he might have done that which he did not do. It is much more consonant with reason to determine the effect of the deed by the intention existing up to the time of death than to refuse to give it that effect because the intention might have been changed.' '' (Citing from *Newton* v. *Bealer,* 41 Iowa 334, and *Martin* v. *Flaharty,* supra.)

The following cases are comparable on the facts to this one. They show the general attitude of the courts throughout the land to make conveyances like these effective through express words of direction showing an intention to deliver without a reservation of the power to revoke is lacking.

In *McNichols* v. *McNichols,* 299 Ill. 362, 132 N. E. 448, 450, after setting up the purpose for which the deed in question was executed and saying that the grantor knew the purpose, the court said: ''With that understanding she simply signed the deed and acknowledged it, as already stated, and left it with Walker [the third party] without any directions whatever by words, but with the intent, as the evidence shows, of carrying out her part of the transaction. There was sufficient delivery of both deeds to pass title both upon the part of the widow and of Miss Johnson. No particular form is necessary to constitute a valid delivery of a deed. It may be by acts without words or by words without acts, or by both. Anything which clearly manifests an intention of the grantor and the person to whom it is delivered that the deed shall presently become operative and effectual constitutes a sufficient delivery.''

In the case of *White* v. *Chellew,* 108 Wash. 628, 185 Pac. 621, 622, the facts were that, at the time the deed and will were executed, Samuel Chellew had been informed that he was in extremis and could live but a short time. Mr. White, the executor, testified in substance that no directions whatever were given

with reference to the delivery of the deed; that Samuel Chellew during the afternoon when the deed and will were made looked them over while they were lying on the table, and stated that they were all right. Upon the next day Samuel Chellew died. After stating the general rule that whether or not there was effective delivery depended upon the intent of the grantor, the court held that the circumstances showed the requisite intent and then said: ''There is nothing in the record before us to show that Samuel Chellew, at the time he executed this deed, intended to reserve any interest in the property. According to Mr. White, who drew the deed and the will, the grantor made no reservation. This deed and will were made on the 8th day of December, 1916. * * * Upon the day following, or shortly thereafter, Mr. White, who drew the deed and the will and having the same in his possession, delivered the deed to [grantee] and stated to him that the property was his, and that he should look after it, or words to that effect, thus indicating that Mr. White understood, at least from the conduct of the grantor, that the grantor intended an immediate delivery of the deed. We think there can be no escape from the conclusion under the authorities above cited that the deed became immediately effective and conveyed the present title to Vivian Chellew.''

In *Watson* v. *Cox,* 117 S. C. 24, 108 S. E. 168, 169, the scrivener could not remember whether the grantor had said to keep the deeds in question and then deliver them upon his death to his children or ''keep them for me and give them to my children.'' The court, in holding that there was an effective delivery, had this to say:

''When Sam Cox [the grantor] had this land survey, divided, and platted, and procured the various deeds to be drawn up, and signed in the presence of witnesses, and then turned them over to [the third party] he surely intended to do something effective. He either intended to fully execute deeds, or his conduct was idle. It makes but little difference whether he directed Childress to keep the deeds and deliver them after his death, or to keep them for him and deliver them to his children, he must have intended

that through this medium they should be transmitted to the various grantees.

"We prefer and do conclude that he intended to do something effective rather than that his conduct was idle and amounted to nothing."

In *Brown* v. *Westerfield*, 47 Neb. 399, 66 N. W. 439, 53 Am. St. Rep. 532, the facts were that the scrivener was informed by the grantor that she wished to divide her property in a certain manner and that in pursuance of this request the two deeds were prepared by the witness and then signed and acknowledged. ·He was requested to keep them and place them upon record after her death. Two or three days later he took the instruments to . the grantor's house and put them into a certain box which she kept for the purpose of preserving documents. Subsequently she said on a number of occasions that she was pleased with what she had done in speaking of the deeds and of "the disposition she had made of the property." The court held the delivery sufficient.

In *Hall* v. *Dollarhide,* 116 Okl. 180, 244 Pac. 813, 814, the grantor executed a deed which he delivered to the scrivener with directions to file it for record when the grantor died and then grantor, although seeing the custodian on two occasions after the deed was made, said nothing about the deed. The court said:

"The intent of the grantor should control, if his intent can be determined. There is no doubt from the evidence submitted by the plaintiffs, that the grantor * * * intended that [the grantee] should have the 54 acres of land described in the deed. The plaintiffs insist that their proof tends to show that the grantor kept, or intended to keep, the deed in his control, since he left it in the hands of Prather, and, if it was so kept in his control, the grantor might have changed it or revoked it, and therefore the deed was evidence of intention to make testamentary disposition of the land, and was not operative as a deed passing title *in praesenti,* and could not be operative as a will, since not executed as a will is required to be executed. It seems that a similar con-

tention was made in *Newton* v. *Bealer,* 41 Iowa 334. The contention was disposed of in this language:

" 'Where one who has the mental power to alter his intention, and the physical power to destroy a deed in his possession, dies without doing either, there is, it seems to us, but little reason for saying that his deed shall be inoperative, simply because during life he might have done that which he did not do.'

"There seems to be no doubt that the grantor had the mental power to alter his intention. Whether he could have recalled and destroyed or changed the deed, or whether he intended to keep the deed within his power and control, is speculative, but the fact remains that, after giving direction to record the deed at his death, he never again spoke of the deed to Prather, the custodian in whose hands he left the deed.

"There being nothing to indicate the contrary, we must assume that both Charles R. Hall and W. M. Prather, at the time the matter of disposition of the 54 acres of land was under consideration, knew the legal effect of disposition by will or by deed. The grantor was looking for effective means of passing title to Russell A. Dollarhide. To make testamentary disposition of the 54 acres of land was thought of and talked about. It must be assumed that they knew that a will could not take effect until the testator's death; also it must be assumed that they knew that the legal and effective means of passing the title *in praesenti* was by a deed. They are also presumed to have known that an instrument, in form a deed, could not be treated as a testamentary disposition of the land, unless the statutory formalities for testamentary disposition were complied with. Knowing these things as they must be held to have known, there being nothing to show that they did not know, why should Hall have Prather prepare a deed and him execute it, instead of making a will? The reasonable, legitimate, and logical inference to be drawn from Hall's having made a deed instead of making a will is that he intended to pass the title to Russell A. Dollarhide *in praesenti*. By a deed was all the means by which this could be done; and under the proof offered by the plaintiffs it must be presumed and inferred that such was the

intention of Hall when he made a deed instead of a will. No reasonable inferences are to be drawn to the contrary from the plaintiffs' evidence. Whether the grantor intended to retain possession of the land until his death, there seems to be nothing in the evidence to advise the court. It seems that whether or not such was his intention is a matter of no consequence. The deed was executed on the 13th of December, 1921, and the grantor died in March, 1922, without indicating his intention as to the matter of possession.''

In *Henry* v. *Phillips,* 105 Tex. 459, 151 S. W. 533, 535, the directions to the cashier of the bank were: ''Here is a deed [to the grantees named] that I want to lay away in the vault for safe-keeping, and the deed to be delivered after my death to them.'' The cashier testified: ''I do not remember that he said anything about reserving any right to recall the deed.'' In discussing the case the court said:

''Stress seems to be laid upon the idea that [grantor] did not by any act or declaration of his lose control of the deed after he had duly executed it and placed it in the bank for safe-keeping and delivery to the grantees after his death. We do not think from the findings of fact that there is any evidence, or any circumstance proven by any competent testimony in the findings of the appellate court, or in the record, that proves, or tends to prove, that [grantor] did not part with all control over the deed when he handed it to the cashier of the bank with the declaration that he desired the deed, which he said conveyed some land to the grantees, deposited in the vault of the bank for safekeeping and delivery to them after his death. But why cavil over the issue whether the grantor did or not deposit the deed with the bank for safe-keeping and subject to his control, if he executed the deed conveying the land therein described to the grantees named, and declared his desire that it should be delivered to them after his death? His act in executing the deed accompanied with his positive declaration of his purpose in so executing it and his desire that it should be delivered to the grantees after his death had the effect in law to convey the title in the land to the grantees.

in the deed with possession and the usufruct in the grantor. It had precisely the same effect as if he had made and delivered the deed to the grantees, conveying them the fee, reserving to himself in the deed the use and enjoyment of the land for and during his natural life.

"The question of delivery of a deed is one of intention on the part of the grantor, and an actual or manual delivery by the grantor in person to the grantees is not essential to pass the title. (*Brown* v. *Brown*, 61 Tex. [56], 60; Devlin on Deeds, sec. 275.) If it be shown that the deed was duly executed by the grantor and that it was his purpose and intention to deliver, or have delivered such deed to the grantees, the law will aid such intention and give it like effect as if the deed had been actually delivered. * * *

"We have his positive declaration that the deed was for land granted by him to the grantees named in the instrument, and that he desired and intended that the deed should be delivered to them after his death. This declaration evidenced his purpose and intent in executing the deed to convey the land to the grantees, and to have the deed delivered to them after his death. Or what was in legal effect the same, he had conveyed to the grantees the property, but desired to retain possession and enjoy the fruits of the land while he lived, knowing that a deed takes effect only from the date of its delivery. (*Tuttle* v. *Turner* [*Wilson & Co.*], 28 Tex. [759], 773; Devlin on Deeds (2d Ed.) sec. 264.) * * *

"Whatever view might be taken of the grantor's right to control the deed, we have the declaration of his purpose, and the fact that the grantor lived for many months within a short distance of the bank and never called for the deed, or disposed of the land. What more may it be thought was necessary to be shown to establish grantees' title?"

In the case of *Hinshaw* v. *Hopkins*, 37 Cal. App. (2d) 230, 99 Pac. (2d) 283, 285, the grantor was suffering from a malignant cancer. The grantee was her housekeeper who performed many services for her. She told several people prior to the time of the

execution of the deed that she planned to give the property to Mrs. Hopkins. Grantor in making the deed stated to the scrivener that she wished him to keep the deed and put it on record after her death, saying: "I wish you would take this deed and put it in your safe deposit box or your safe, or some place where it will be in safe keeping. And under no circumstances would I want you to lose possession of this deed, because if I get well I want it returned to me in order that I may destroy the deed." Witnesses testified at some length that the grantor stated after the execution of the deed that she deeded the property to the grantee and that it would be the grantee's property upon the grantor's death. She subsequently made a will but the will contained no mention of the property described in the deed. The lower court found that it was not the intention of the grantor to reserve in herself any power to recall or modify the deed.

"Appellants contend that there was no evidence sufficient to overcome what appellants claim was the definite, unimpeached testimony of Floyd M. Hinshaw that the delivery was conditional.

"The question then presents itself as to how far the testimony of Floyd M. Hinshaw that the delivery of the deed was conditional was binding upon the trial court."

The court held that her failure to make a deed, her statement prior to the time of the execution of the deed that she intended to deed her property to the grantee, her unquestioned intention that the grantee was to have the property and "her declarations made after the signing of the deed were to the effect that she had made a deed and had given the property to respondent. Such declarations are admissible as bearing on the question of delivery and support the finding of the trial court that Mrs. Dornberger intended to and did deliver a deed of said real property to respondent, and that it was not her intention to reserve any power to recall or modify said deed."

In *Williams* v. *Kidd,* 170 Cal. 631, 151 Pac. 1, 7, Ann. Cas. 1916E, 703, it was held: "The conduct and declarations of Williams [the grantor] covered a period subsequent to the making of the deed and while Kidd held it as a depositary, and

we are satisfied that such acts, conduct, and declarations of Williams with reference to the property during that period were properly admissible as bearing on the issue as to whether there had been a delivery of the deed." (See. also, *Fisher* v. *Oliver*, 174 Cal. 781, 164 Pac. 800.)

In *Hinshaw* v. *Hopkins*, supra, the court concludes that: "It is the exclusive function of the trial court to weigh the evidence and determine the credibility of the witnesses. An appellate court will not disturb the findings of the trial court when there is a substantial conflict in the evidence on material points, and when there is some evidence to support the findings. The record in this case shows a substantial conflict in the evidence, and there is ample evidence to sustain the judgment."

For the above reasons I think the judgment should be affirmed.

MR. JUSTICE ANDERSON:

I concur in the dissenting opinion of MR. JUSTICE ERICKSON.